No. 131.—JAMES M. REID, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] It is no objection to the testimony of a witness, that he has come to the knowledge of a party's handwriting since the difficulty arose, nor that means were used to obtain that knowledge: *Aliter,* if the witness' knowledge was acquired under such circumstances as would show that the party had a motive for disguising it.

[2.] The presumption is, that every slave is in the possession of his owner, actual or constructive; and the fact that he had absconded at the time he was stolen, does not raise the presumption that he had left the *county* of his master's residence.

[3.] Acts and declarations of one of a company of conspirators, is original evidence against each of them, in regard to the common design ; and consequently, affects his fellows. But subsequent declarations, which are the narrative merely of past occurrences, are inadmissible except against the party making them.

[4.] Proof that several of the conspirators (the defendant included) approached the most material, if not the only witness to the offence, and used efforts to get her out of the way to prevent her from testifying, may be re-

Reid *vs.* The State.

ceived; and this does not conflict with the rule excluding the subsequent declarations of one of the conspirators.

[5.] *All* criminal cases must be tried under the Act of February 28th, 1856, declaring who are qualified and liable to serve as Jurors in such cases, whether the offence was committed before or after the passage of that Act.

Simple larceny, in Upson Superior Court.

The Reporter was furnished with no bill of exceptions in this case, and the statement of facts made out at the term has been unfortunately lost. The facts are sufficiently stated in the opinion.

GREEN; STUBBS & HILL; TRACY, for plaintiff in error.

Sol. Gen. LYON, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

I labor under the disadvantage of writing out this opinion without having the bill of exceptions or a copy thereof, or the Reporter's statement of facts—none of which have ever come into my hands. I am dependent, therefore, entirely on memory for the errors assigned, and upon the transcript of the record.

One ground of complaint was, that the Court refused to continue the cause. We need not consider this point, as it will not arise upon the next trial.

[1.] One of the main errors alleged was, the method of proving the handwriting of the defendant. Thomas W. Reveire, the owner of the stolen negro and prosecutor, testified that he procured Reed, the accused, to write in his presence, for the purpose of becoming acquainted with his hand; and from his knowledge of it, obtained in this way, he believes the letter dated 20th of November, 1855, at Milledgeville, to be in James M. Reid's handwriting. He further stated, that there was a peculiarity in his penmanship, both as to forma-

tion of letters and the spelling of words; as, for instance, always using "hit" for *it*.

Now it is insisted by Mr. Hill, that this mode of proving the handwriting is inadmissible—and authority is cited to sustain the objection. But in the opinion of this Court, it fails to subserve the purpose for which it is adduced. What was the case of *Stranger vs. Searle?* (1 *Esp. N. P. Rep.* 14.) It was an action against the defendant, as acceptor of a bill of exchange. The defence set up was, that the handwriting subscribed to the bill and purporting to be his acceptance, was a forgery. Defendant's Counsel proposed to introduce a witness to prove, that previous to the trial the defendant had written his name and showed it to him, for the purpose of letting him see his true manner of writing it, that the witness might be able to distinguish it from the pretended acceptance to the bill in question.

But Lord *Kenyon* very properly told him that he should not permit that to influence his judgment, as the defendant might write differently from his common mode, through design.

And this is the purport of all the cases relied on to uphold the objection. It will be found, on examination, that the objection is not, as Counsel supposes, because the witness came to the knowledge of the party's handwriting since the difficulty arose, nor that means were used to obtain that knowledge. The question and the test to be applied in all such cases is, was the witness' knowledge acquired under such circumstances as would show that the party had a motive for disguising his handwriting? If so, the testimony should be excluded. Else, a party would be permitted to manufacture testimony for himself.

To apply the rule: Had Reid got some one to see him write, and then tendered him as a witness to disprove the genuineness of the Milledgeville letter, the witness would be clearly incompetent—because Reid would have the strongest motive for disguising his handwriting. And the essential difference between that case and the one actually before us

Reid *vs.* The State.

is the *undesignedness* of the latter, so far as Reid, the writer, is concerned. Did he suspect Reveire as trying to circumvent him? If so, his policy would obviously have been to disguise his hand instead of writing naturally, as he did. And slightingly as Counsel treat the identity of orthography, writing "hit" for "it" in both documents, it is a pretty decided *hit* after all.  So is this!

[2.] Another assignment of error is, that the Court excluded from the Jury all benefit of the facts (if they should so find them to be) that the negro, on the 25th of September, 1855, voluntarily ran away; and if he did so abscond, then the presumption that he was taken from his master, was rebutted.

The point of this objection we understand to be this: The theft is alleged to have been committed in Upson County, where Thomas W. Reveire, the owner of the negro, resided, on the 25th day of September, 1855. Counsel contends, that if at that time the slave had run away, that the presumption that he was stolen from the possession of his master, is rebutted. But the question is, not whether Edward, the subject of the felony, was in the actual possession of his master at that time, but whether he was cloigned from Upson County on the day charged. The presumption is, that every slave is in the possession of his owner. Reveire lived in Upson County. Does the fact that the negro had absconded raise the presumption that he had left Upson County? We think not. The slave, wherever he was, though not in the actual, was still in the constructive possession of the owner, so as to constitute the taking and sale of him larceny. And although not in his actual possession, on the plantation of his owner, we do not see that it is to be presumed that he had left the county. The presumption, from the proof, is the other way. Establish a contrary doctrine, and it might become exceedingly difficult to locate a larceny; for it frequently happens that the crime commences by inducing slaves to run away; and yet, it would be difficult, if not impossible, from its secresy, to substantiate it. There is proof

in this case, whether credible or not we cannot decide, from which the Jury might infer that this slave departed from the service of his owner, in consequence of a concerted plan between the Reids and himself; for one of the witnesses testifies, that she heard them say that "the negro should do Tom Reveire no good all the year; that they would keep him runaway, and Reveire would whip him severely; when they would report, that Reveire had killed him and made the other negroes bury him after night."

[3.] [4.] The next question, and perhaps the most difficult one presented is, was the Court right in admitting evidence of what the confederates said and did subsequent to the consummation of the crime?

Mr. *Greenleaf,* after stating the general rule, that the acts and declarations of one of a company of conspirators, is original evidence against each of them in regard to the common design, and therefore affects his fellows, remarks, " that care must be taken that the acts and declarations thus admitted, be those only which were made and done during the pendency of the criminal enterprise and in furtherance of its objects; and that if they took place at a subsequent period, they are to be rejected as the narrative merely of past occurrences." (1 *Greenleaf on Ev.* §111.)

We have examined carefully all the authorities cited in support of this position; and to say the most of them, they are vague and unsatisfactory, and can hardly be considered as warranting the text. Indeed, not one of the precedents referred to can be relied on as sustaining it. (See *Rex vs. Watson,* 32 *Howell's State Trials,* 7 *per Bayley, J.; Rex vs. Brandreth, Id.* 857, 858; *Rex vs. Hardy,* 24 *Howell's State Trials,* 451, 452, 453, 475; *American Fur Co. vs. The U. States,* 2 *Peters,* 358, 365; *Crowninshield's case,* 10 *Pick. R.* 497; *Rex vs. Hunt,* 3 *B. & Ald.* 566; 1 *East's P. Cr.* 97, §38; *Nichols vs. Dowding,* 1 *Stark. R.* 81.)

The case mainly relied on, we apprehend, in support of the rule under consideration, is that of *Hardy,* (24 *State Trials.*) The defendant was prosecuted· for high treason,

and Counsel for the Crown, amongst other evidence, tendered in proof a letter purporting to have been written by one Thelwall to one Vellam, giving to the latter an account of certain seditious songs sung at one of the meetings of the conspirators, Thelwall himself being implicated as one of them. A majority of the Court, with great hesitation, *Buller* and *Grose* dissenting, rejected the testimony, upon the ground that the bare relation of acts by one of several persons to whom the conspiracy is imputed, to a perfect stranger, is no more than an admission which may possibly affect himself, but cannot possibly affect any of his co-conspirators.

Subsequently, however, in the same proceeding, the Court held that a communication addressed by one of several conspirators to another, would be admissible, as it would serve to prove the general nature and tendency of the conspiracy. (*Ibid,* 475.)

Confining, then, the decision in Hardy's trial to the exact circumstances of the case, we submit, respectfully, that it falls short of the broad principle laid down by Mr. *Greenleaf* and other elementary writers.

In *Wright vs. Cant,* (2 *C. & P.* 232,) which was an action for false imprisonment, the declaration of a co-defendant, showing personal malice, though made in the absence of the others, and several weeks after the fact, was admitted without being restricted to the party making it.

Now the negro was stolen, if I understand the record correctly as to dates, which, owing to the omission to insert the questions, is left in doubt, the last of September, 1855. The concert and co-operation in the larceny of the four brothers, Reids, is distinctly established by the witness, Susan Deloach, who further testifies, that shortly thereafter, to-wit: in October or November, they each approached her (James M. Reid, the accused, amongst the rest) and endeavored to prevail on her to go off to Florida, or elsewhere, so as to get rid of her testimony; and that Phillip Reid, one of them, offered to pay her one hundred dollars to induce her to leave.

It seems to us, upon the best reflection we can give to the subject, that the evidence was properly received.

[5.] The only remaining question which we deem it necessary to notice is, was the Court right in ruling that the Jury should be impanneled under the law of force at the time the offence was committed, and not under the Act of 1856?

The Penal Code provides, that "All crimes and offences committed shall be prosecuted and punished under the laws in force at the time of the commission of such crime or offence, notwithstanding the repeal of such laws before such trial takes place." (*Cobb*, 838.)

It is conceded that the Act of 1856, (*Pamphlet*, 229,) declaring who are qualified and liable to serve as Jurors in criminal cases, prescribes a different mode of impanneling a Jury, from the one which was in force at the time this offence was committed; and it repeals all conflicting laws. It is apparent, therefore, that the defendant must be tried under the Act of 1856, or not at all.

*Reynolds vs. The State*, (3 *Kelly's R.* 53,) is relied on as authority to show that the defendant should have been tried under the old law, and not under the new. The two cases differ in this: By the 48th section of the 14th division of the Penal Code of 1833, a certain method was prescribed for impanneling a Jury in a criminal case. By the Act of 1843, a different rule was substituted in lieu of this; and one confessedly more rigorous for defendants. The Court was involved in this dilemma: either to impute to the Legislature an intention to let all criminals escape, or to violate the Constitution by passing an *ex post facto* law. Seeing that the 34th section of the 14th division of the Penal Code, allowing offences to be prosecuted under the law in force at the time of their commission, was untouched by the Act of 1843, rather than resort to either of the foregoing alternatives, the Court determined that the accused was properly tried under the old law.

But we repeat, the last section of the Act of 1856 repeals not only the 34th section of the 14th division of the Penal

Code of 1833, but all other previous laws in conflict with it; and enacts that "*all* criminal cases" shall be tried in the mode therein prescribed; and would seem, not only from the generality of the words already quoted, but from its peculiar phraseology, to apply to *past* as well as future offences. Indeed, rather more so "when any person *stands* indicted," &c.

That it was competent for the Legislature of 1856 to repeal the Statute of 1833, no one will question, inasmuch as no Legislature can bind its successor, except in matters of contract.

We held at Savannah last June, that the Act of 1856 was constitutional, viz: was not an *ex post facto* law. It insures to persons accused an impartial Jury. They are entitled to no more. A law which facilitates the trial merely, does not, on that account, impair any *right* of the defendant. He is entitled to a fair Jury, but cannot complain if the chances of escape are cut off by removing the obstacles in selecting a Jury.

By some singular oversight, it has been objected to the late law, that it abolishes triors. Not so; it simply substitutes the *Court* in the place of triors under the old law. What fair-minded man will gainsay the change? Where the public excitement runs high against the party, the firmness of the *Bench*, in seeing that none but indifferent or disinterested Jurors are put in the box, may constitute the defendant's only shield and protection.

We are constrained, for the foregoing reasons, to decide that the Court committed error in this ruling—misled, most probably, by the opinion of this Court in Reynolds' case.

All the other exceptions in the writ of error are overruled.